**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES MARSHALL,** | ) | |
| Plaintiff, | ) | **Civil Action No. 10-169Erie** |
| | ) | |
| v. | ) | **District Judge Maurice Cohill** |
| | ) | |
| **RAYMOND SOBINA, et al,** | ) | **Magistrate Judge Susan Paradise Baxter** |
| Defendants. | ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

## I.    RECOMMENDATION

It is respectfully recommended that the motion for summary judgment filed by Prison Health Services Defendants Baker, Telega, Gilreath and Mowry [ECF No. 116] be GRANTED IN PART AND DENIED IN PART, as follows:

- Granted on the basis of failure to exhaust as to the claims against Baker and Gilreath;

- Denied on the basis of failure to exhaust  as to the claims against Mowry and Telega;

- Denied on the basis of failure to show deliberate indifference to a serious medical need.

Defendants Baker and Gilreath should be dismissed as parties to this action.

It is further recommended that the partial motion for summary judgment filed by the Commonwealth Defendants [ECF No. 112] be GRANTED IN PART AND DENIED IN PART, as follows:

- Denied on the basis of failure to exhaust;

- Granted with regard to the deliberate indifference claim against Defendant Lucas based upon delay in medical treatment;

- Granted as to the retaliation claims based on Misconduct B144269 for Possession of Contraband and the concomitant cell search of February 2nd, and Misconduct A913573 for Refusal to Obey an Order;

- Denied as to the retaliation claims based on the termination of employment and the cell searches of February 10th, February 14th and March 8th.

Defendant Lucas should be dismissed as a party to this action.

By separate Memorandum Order, the motions to strike exhibits [ECF Nos. 123, 133] are denied.

## II. REPORT

### A. Relevant Procedural History

Plaintiff, a state inmate incarcerated within the State Correctional System, initiated this civil rights action on July 13, 2010. Plaintiff, acting *pro se*, alleges that Defendants violated his constitutional rights under the Eighth Amendment in numerous ways during his incarceration at SCI Albion from January through June of 2010. Plaintiff claims he was assaulted by Defendant Hewitt, a guard, received inadequate medical care following the assault, and he was retaliated against by the Commonwealth Defendants after he filed grievances. ECF No. 4. As Defendants to this action, Plaintiff names the following: Raymond Sobina, Superintendent; Maxine Overton, Health Care Administrator; Lieutenant William McConnell; Lt. Robertson; Col. Hewitt; Scott Breckenridge, an employee of the Food Service Department; and Ralph Lucas, an RN, all of the Department of Corrections of the Commonwealth (hereinafter referred to as the "Commonwealth Defendants")[1]; and Daniel Telega; Tammy Mowry; Dr. Mark Baker; and Dr. Valerie Gilrealth,

---

[1] In this case, the Commonwealth Defendants are represented by the Office of the Attorney General. Over the course of this litigation, three separate counsel from that Office have provided legal representation in this case.

all of Prison Health Services, Inc. (hereinafter referred to as the "PHS Defendants"). These two groups of Defendants are represented separately.

In response to the Complaint, the Commonwealth Defendants Robertson, Lucas, McConnell, Breckenridge, Sobina, and Overton[2] filed a partial motion to dismiss arguing that Plaintiff failed to adequately allege personal involvement by Defendants Robertson, Lucas, McConnell, Breckenridge, Sobina, and Overton. ECF No. 24. The PHS Defendants filed a motion to dismiss arguing for dismissal based in part upon Plaintiff's failure to state a claim of deliberate indifference. ECF No. 33. These motions were granted in part and denied in part and Defendants Robertson and Overton were dismissed from this action. ECF Nos. 53, 55.

Thereafter, discovery ensued and Defendants filed motions for summary judgment. By Report and Recommendation issued on August 30, 2013, I recommended that motions for summary judgment by both sets of Defendants be granted in part and denied in part. ECF No. 105. Both sets of Defendants, as well as Plaintiff, filed Objections to the Report and Recommendation. ECF Nos. 106, 107, and 109. Most significantly, in the Objections filed by the Commonwealth Defendants, counsel acknowledged that she had prepared and submitted the Declaration of Captain Jeffrey White which contained important factual errors[3]. The Report and Recommendation included citations to the now-discredited affidavit.

---

[2] Defendant Hewitt filed an Answer to the Complaint and did not join in the motion to dismiss or the motion for summary judgment.

[3] Attorney Friedline explained that in preparing her Objections to the Report and Recommendation, she:

> "realized that the Declaration she prepared for Captain White in relation to the 3/8/10 cell search contained an error in ¶ 3. In paragraph 3, Captain White referred to records of the search of Plaintiff's cell (C/B 3) on 2/2/10, in which contraband that could be used as a weapon was found, belonging to Plaintiff's cellmate Chadwick. The date referenced in paragraph 3 of that declaration – 2/2/10 – was incorrect and should have been **2/14/10.** Undersigned counsel physically prepared the declaration in consultation with Captain

Thereafter, District Judge Cohill remanded the entire matter to me for further review, opining:

> Having reviewed *de novo* the pleadings in this case as well as the various documents of record related to the motions for summary judgment filed by the Defendants and Plaintiff's responses thereto, including the new evidence submitted by the Commonwealth Defendants, the Court finds that the Plaintiff must have the opportunity to review the new evidence and its effect on his claims against Defendants and that Magistrate Judge Baxter may want to vacate her Report and Recommendation in light of the new evidence. Accordingly, we are remanding this matter back to Magistrate Judge Baxter in order for her to determine how best to handle the new evidence submitted by the Commonwealth Defendants.

ECF No. 110. Based upon District Judge Cohill's instructions and because Plaintiff is a *pro se* litigant to whom much latitude was given due to the unusual procedural posture of this case, I vacated the Report and Recommendation and ordered both sets of Defendants to file new motions for summary judgment. ECF No. 111.

Presently pending before this Court are the re-filed motions for summary judgment filed by both sets of Defendants, along with Opposition briefs filed by Plaintiff. These issues are fully briefed and are ripe for disposition by this Court.[4]

---

White himself (who had been transferred to SCI Mercer by that point) and Lt. Gilbert who was still at SCI Albion with the security search records. When I went back and reviewed those search records after receipt of the Report and Recommendation on 8/30/13, I realized that I had mistakenly referred to the 2/2/10 date in paragraph 3, rather than the intended date – 2/14/10. This is clearly shown on the search logs (Exhibit 21, attached hereto), which reflect that Plaintiff and Chadwick were in CB 3 on 2/14/10 and the subject of a random search that day, where officers found Chadwick had a broken razor. Exhibit 21, page 2."

[4] Plaintiff has also filed a Motion for Sanctions pursuant to Federal Rule 37 which remains pending. ECF No. 128. See also ECF Nos. 130, 131. The bases of this motion are Exhibits 20, 21, 22, and 23 attached to the Department of Corrections Defendants' motion for summary judgment. Plaintiff argues that Defendants should be sanctioned due to their failure to disclose or supplement their answers to Interrogatories. Resolution of this motion and attendant issues of forgery of evidence will necessarily affect evidentiary rulings for trial and, as such, will be left for the trial judge to determine.

**B. Standards of Review**

**1)** *Pro Se* **Litigants**

*Pro se* pleadings, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520-521 (1972). If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. Boag v. MacDougall, 454 U.S. 364 (1982); United States ex rel. Montgomery v. Bierley, 141 F.2d 552, 555 (3d Cir. 1969)(petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance"); Smith v. U.S. District Court, 956 F.2d 295 (D.C.Cir. 1992); Freeman v. Dep't of Corrections, 949 F.2d 360 (10th Cir. 1991). Under our liberal pleading rules, during the initial stages of litigation, a district court should construe all allegations in a complaint in favor of the complainant. Gibbs v. Roman, 116 F.3d 83 (3d Cir. 1997). See, e.g., Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)(discussing Fed.R.Civ.P. 12(b)(6) standard); Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990)(same). Because Plaintiff is a *pro se* litigant, this Court may consider facts and make inferences where it is appropriate.

**2) Motion for Summary Judgment**

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Under Rule 56, the district court must enter summary judgment against a party "who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 quoting F.R.Civ.P. 56. However, "if there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will not." El v. Se. Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007).

The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex, 477 U.S. at 330. See also Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007); UPMC Health System v. Metropolitan Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004). When a non-moving party would have the burden of proof at trial, the moving party has no burden to negate the opponent's claim. Celotex, 477 U.S. at 323. The moving party need not produce any evidence showing the absence of a genuine issue of material fact. Id. at 325. "Instead, ... the burden on the moving party may be discharged by 'showing'-that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Id. After the moving party has satisfied this low burden, the nonmoving party must provide facts showing that there is a genuine issue for trial to avoid

summary judgment. <u>Id</u>. at 324. "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." <u>Id</u>. <u>See also</u> <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001); <u>Garcia v. Kimmell</u>, 2010 WL 2089639, at * 1 (3d Cir. 2010) <u>quoting</u> <u>Podobnik v. U.S. Postal Serv.</u>, 409 F.3d 584, 594 (3d Cir. 2005) (the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue."); <u>Berckeley Inv. Group, Ltd. v. Colkitt</u>, 455 F.3d 195, 201 (3d Cir. 2006) ("In this respect, summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.").

In considering these evidentiary materials, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007) (internal quotation marks and alterations omitted). <u>See also</u> <u>Doe v. Cnty. of Centre, Pa.</u>, 242 F.3d 437, 446 (3d Cir. 2001) (when applying this standard, the court must examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. <u>Anderson</u>, 477 U.S. at 248, 255 ("only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only

to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 249. The court may consider any evidence that would be admissible at trial in deciding the merits of a motion for summary judgment. Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993).

### C. Plaintiff's General Factual Allegations

#### 1) Allegations against the Commonwealth Defendants

Plaintiff alleges that around January 28, 2010, he and Defendant Hewitt became involved in a verbal and physical confrontation that resulted in injuries to Plaintiff. ECF No. 4, Complaint, ¶¶ 21-29.

Plaintiff alleges that Defendant Lucas, an RN and employee of the Department of Corrections, initially denied him emergency admission to the Medical Department until Plaintiff wrote up a sick call slip requesting medical attention. Id. at ¶¶ 32-34. Plaintiff alleges that once he eventually arrived at the Medical Department, he was seen by Defendant Lucas who only took his vital signs and interrogated him in a hostile manner about the cause of his injuries. Id. at ¶ 34. Plaintiff alleges that Defendant Lucas deliberately advised PHS Defendant Telega, the physicians' assistant who conducted the physical examination, that Plaintiff was alluding to an assault by an officer and Defendant Lucas attempted to "sabotage and deprive the Plaintiff of treatment to cover evidence of Defendant Hewitt's assault." Id.

Defendant McConnell allegedly engaged in a campaign of retaliation against Plaintiff beginning on January 29, 2010, after he was assigned as the grievance officer (presumably to investigate the physical encounter between Defendant Hewitt and Plaintiff). Defendant McConnell allegedly watched Plaintiff on the security camera and directed another officer (Fries,

8

not named as a defendant to this action) to fabricate a misconduct report based on the possession of food contraband. McConnell also ordered others to remove Plaintiff from his kitchen job and conduct repeated cell searches on February 2nd, 10th, and 14th. Id. at ¶ ¶ 42-47. McConnell also ordered an investigative cell search and strip search on March 8th. Id. at ¶ 58.

Plaintiff alleges that on February 13th, Defendant Breckenridge, an employee of the food service department, fabricated a misconduct against him based on the failure to obey an order in retaliation for Plaintiff's grievance against Hewitt. This misconduct caused Plaintiff's removal from his employment in the food service department. Id. at ¶ 52.

Plaintiff alleges that Defendant Warden Sobina was responsible for and involved in the inadequate medical treatment as well as the campaign of retaliation.


**2) Allegations against the PHS Defendants**

Plaintiff was examined by Defendant Telega on January 28, 2010, the date of the incident. According to Plaintiff, Telega treated him "aggressively" and "meanly," and when Plaintiff was physically unable to put his right arm behind his back (due to his broken collar bone), Telega "became angry, and aggressively and vindictively applied pressure to the Plaintiff [sic] collarbone." Id. at ¶ 35. Telega allegedly lost control, cursed at Plaintiff, told him he was faking, and told him to "get the fuck out his office and to get dress [sic] in the hallway." Id. at ¶ 36. At this visit, Plaintiff received no pain medication, no ice for swelling, and no x-ray. According to Plaintiff, Defendants Telega and Lucas denied that any injury existed. Id. at ¶ 38.

Plaintiff was seen by Defendant Mowry on February 1, 2010, after he submitted a sick call slip requesting medical attention. Id. at ¶ 39. Mowry then refused to provide Plaintiff with any medical treatment telling him that she would not second guess another physician assistant.

Id. Plaintiff showed his swollen collarbone to Mowry and he was asked to leave her office.

Plaintiff requested that photos be taken of his injuries and an officer photographed Plaintiff.[5] Id.

at ¶ 40. Plaintiff renewed his request for pain medication and Mowry charged Plaintiff for ten

days of pain medication, but he received none for several days. Plaintiff alleges that Mowry

performed no physical examination. Id.

On February 5, 2010, an x-ray was taken of Plaintiff's right shoulder. Id. at ¶ 48. On

February 11, 2010, Plaintiff was seen by Defendant Mowry[6] for his "chronic pain from his chest

and shoulder that his collarbone protruding out his chest." Id. at ¶ 49. Defendant Mowry refused

any medical treatment. When Plaintiff requested that Defendant Mowry perform an exam of the

lump on this chest, she became hostile and told him the x-ray indicated there were no injuries.

Id. at ¶ 50.

On February 18, 2010, Plaintiff was seen by Defendant Dr. Gilreath who examined the

collarbone, found it abnormal, and ordered further x-rays and 30 days of pain medications. Id. at

¶ 54. On March 8, 2010, Plaintiff was seen by Defendant Gilreath, who indicated that his x-ray

was negative. Plaintiff requested another medical opinion. Id. at ¶ 59. On April 10, 2010,

Defendant Gilreath examined Plaintiff who complained of chest and shoulder pain. Defendant

Gilreath found the right clavicle abnormal and ordered a CT scan of the area. Id. at ¶ 60.

On May 25, 2010, Plaintiff was transported to Meadville Hospital for a CT scan. Id. at ¶

63. On June 10, 2010, Defendant Gilreath informed Plaintiff that the CT scan revealed that his

clavicle and sternum were both fractured. Id. at ¶ 65. Plaintiff's fractured bones fused together

incorrectly causing deformity. Id. at ¶ 67.

---

[5] No photographs have been made a part of the evidentiary record before this Court.

[6] Since the filing of this action, Defendant Mowry has passed away. Her estate has been substituted as a party to this action.

Plaintiff alleges that Defendant Dr. Mark Baker is the medical director and the primary supervising physician and is responsible for the performance of his physician's assistants.  Id. at ¶ 61.

### D.  PHS Defendants' Motion for Summary Judgment

#### 1)  Exhaustion

##### a.  The Prison Litigation Reform Act

The PHS Defendants move for summary judgment on some of Plaintiff's claims arguing that Plaintiff has failed to exhaust his administrative remedies in accordance with the exhaustion requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), which provides:

> no action shall be brought with respect to prison conditions under section 1983 of this title ... by a prisoner confined in any jail, prisons, or other correctional facility until such administrative remedies as are available are exhausted.

Id. [7] The exhaustion requirement is not a technicality, rather it is federal law which federal district courts are required to follow.  Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000) (by using language "no action shall be brought," Congress has "clearly required exhaustion").

The PLRA's exhaustion requirement "is a non-jurisdictional prerequisite." Small v. Camden County, 728 F.3d 265, 270 n.3 (3d Cir. 2013).[8] The requirement that an inmate exhaust

---

[7] It is not a plaintiff's burden to affirmatively plead exhaustion.  Small v. Camden County, 728 F.3d 265, 270 n.3 (3d Cir. 2013); Jones v. Bock, 549 U.S. 199, 217  (2007) ("...failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints.").  Instead, the failure to exhaust must be asserted and proven by the defendants. Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002). Moreover, "the defendant must prove that the prisoner-plaintiff failed to exhaust *each* of his claims. There is no 'total exhaustion' rule permitting dismissal of an entire action because of one unexhausted claim. Small, 728 F.3d at 270 (emphasis in original) quoting Jones, 549 U.S. at 220-24.

[8] "As such, just as subject matter jurisdiction, personal jurisdiction, and venue, exhaustion is a 'threshold issue that *courts* must address to determine whether litigation is being conducted in the right forum at the right time.'" Small, 2013 WL 450476, at *3, quoting Dillon v. Rogers, 596

administrative remedies applies to all inmate suits regarding prison life, including those that involve general circumstances as well as particular episodes.  Porter v. Nussle, 534 U.S. 516 (2002); Cutter v. Wilkinson, 544 U.S. 709, 723 n.12 (2005) (noting that the PLRA requires that "a prisoner may not sue under RLUIPA without first exhausting all available administrative remedies."); Concepcion v. Morton, 306 F.3d 1347 (3d Cir. 2002) (for history of exhaustion requirement).  See also Spencer v. City of Philadelphia, 2012 WL 1111141 (W.D. Pa.) aff'd 2013 WL 5699510 (3d Cir.).

The PLRA also requires "proper exhaustion" meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules of that grievance system.  Woodford v. Ngo, 548 U.S. 81, 87-91 (2006) ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules ...").  Importantly, the exhaustion requirement may not be satisfied "by filing an untimely or otherwise procedurally defective ... appeal."  Id. at 83.[9]

### b.  Administrative Remedy Process

So then, no analysis of exhaustion may be made absent an understanding of the prison's internal administrative process available to state inmates. "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'  The level of

---

F.3d 260, 272 (5th Cir. 2010). See also Nyhuis v. Reno, 204 F.3d 65, 69 n.4 (3d Cir. 2000) ("...[W]e agree with the clear majority of courts that §1997e(a) is *not* a jurisdictional requirement, such that failure to comply with the section would deprive federal courts of subject matter jurisdiction.").

[9] See also Spruill v. Gillis,  372 F.3d 218, 228-29 (3d Cir. 2004) (utilizing a procedural default analysis to reach the same conclusion) (" Based on our earlier discussion of the PLRA's legislative history, [...] Congress seems to have had three interrelated objectives relevant to our inquiry here: (1) to return control of the inmate grievance process to prison administrators; (2) to encourage development of an administrative record, and perhaps settlements, within the inmate grievance process; and (3) to reduce the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits.").

detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Jones v. Bock, 549 U.S. at 218. See also Spruill, 372 F.3d at 231 (having concluded that the PLRA includes a procedural default component, the Court then indicated that "prison grievance procedures supply the yardstick for measuring procedural default.").

The DC-ADM 804 grievance system, available to state prisoners, consists of three separate stages. First, the prisoner is required to timely submit a written grievance for review by the facility manager or the regional grievance coordinator within fifteen days of the incident, who responds in writing within ten business days. Second, the inmate must timely submit a written appeal[10] to intermediate review within ten working days, and again the inmate receives a written response within ten working days. Finally, the inmate must submit a timely appeal to the Central Office Review Committee within fifteen working days, and the inmate will receive a final determination in writing within thirty days. See Booth v. Churner, 206 F.3d 289, 293 n.2 (3d Cir. 1997), aff'd. 532 U.S. 731 (2001). Furthermore, the Department of Corrections grievance policy requires that grievances must include "a statement of the facts relevant to the claim" and must name or identify the responsible individuals. Spruill, 372 F.3d at 234. See also ECF No. 116-11.

### c. Analysis of Exhaustion

The PHS Defendants argue that Plaintiff has failed to exhaust his claims against Baker and Gilreath, and some of his claims against Mowry. The evidence before this Court reflects that Plaintiff filed several grievances relating to the legal claims against the PHS Defendants:

---

[10] DC-ADM 804 provides that an inmate "may only appeal issues that were raised" in the initial grievance.

-   307841 dated 2/11/10;

-   307831 dated 2/12/10;

-   308385 dated 2/18/10; and

-   312374 dated 3/24/10.

ECF No. 116-10, pages 17-21, 30-36; pages 37-40; pages 10-16; and pages 41-42, respectively.[11]

---

[11] Additionally, Plaintiff filed an initial grievance the day after the incident with Officer Hewitt focusing on the assault and deprivation of his meal, but he did not grieve any claim related to the PHS Defendants. Grievance 306245 dated 1/29/2010 reads:

> "This grievance is an allegation of the following: 1) physical abuse assault, on part of Officer Hewitt, 2) sexual assault, sexual harassment on part of Officer Hewitt and, 3) deprivation of food as punishment on part of CO Hewitt and Lt. Robertson.  On 1-28-10 while attending mourning [sic] meal line CO Modanodo told Officer Hewitt I told someone he was not their supervisor, because Officer Hewitt stopped the line at the window and was yelling and intimidating staff and window worker. When I reached the window to receive my food it was not give[n] to me right away so I mention to the window worker that he was not his supervisor because his supervisor was standing right next to him so it was okay for him to give me my food. While walking to the table CO Modanodo pointed to me telling CO Hewitt I said that he not their supervisor. As I sat at the table to eat CO Hewitt put his hand in my face angerly [sic], loudly demanding to know what block I was on, I told him GB. He then asked me which cell. I asked CO Hewitt why was he standing over me and my food yelling. Why did he want to know what cell I lived in. He then asked me for my ID. I asked the CO could I eat. He told me no to go outside where he told me to get my hands up against the wall and push in the upper right side of back, causing me to hit my collarbone and right shoulder against the edge of the wall at the window injuring me, while doing his search. He then aggressively put his hands around my waist fingers going into my waist band towards my genitals then when pat searching my legs he brought his arm under between my legs upwards very hard against my genital. He then aggressively grabbed me by the right arm and took me twenty foot to Lt. Robertson where he again made me put my hands on the wall to humiliate me. I explained to Lt. Robertson what happen and he concerned with the officer's action and told me to go back to my housing unit. I told him I hadn't eaten and he told me I'm not going to eat."

ECF No. 116-10, pages 4-5. Furthermore, in response to the question that directed that the prisoner list the actions taken and staff contacted before submitting this grievance, Plaintiff wrote: "requested to see medical when I returned to Housing unit due to injury from officer Hewitt pushing me into a wall causing to injure collarbone and shoulder."  Id.

**Baker and Gilreath**

The record reflects that none of Plaintiff's grievances names or identifies either Gilreath or Baker[12]. Plaintiff has provided no evidence to the contrary as he must in the face of a well-supported motion for summary judgment. See Celotex; Fed.R.Civ.P. 56(c)(1)(A). Accordingly, summary judgment should be granted in their favor since the record demonstrates that Plaintiff has failed to exhaust his administrative remedies as to the claims against Gilreath and Baker. The Clerk of Courts should be directed to terminate them from the docket.

**Mowry and Telega**

Grievances 307841 and 307831 involve the lack of medical treatment provided by Telega on January 28th and by Mowry on February 1st, respectively, and were both fully and properly exhausted. See ECF No. 116-10, pages 17-21 and 37-40. Grievance 312374 challenges Mowry's actions on March 22, 2010, relative to the refill of medications, but Plaintiff does not mention this incident in his complaint and does not raise any legal claim based upon it.

Grievance 308385 (filed on February 18th) concerns the lack of medical treatment provided by Mowry on February 11th. Defendants argue that this grievance is unexhausted.

Plaintiff's grievance reads:

---

[12] Plaintiff's claim against Dr. Baker is in his capacity as "the medical director and the primary supervising physician at the medical department at SCI Albion. He legally accept[s] full professional and legal responsibility for the performance of the physician assistance [sic] and the care and treatment of the patients." ECF No. 4, ¶ 61. When a supervisory official is sued in a civil rights action, liability can only be imposed if that official played an "affirmative part" in the complained-of misconduct. Rode v. Dellarciprete, 845 F.2d 1958, 1207 (3d Cir.1988); Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir. 1986). Section 1983 liability cannot be predicated solely on *respondeat superior.* Rizzo v. Goode, 423 U.S. 362 (1976); see also Monell v. Dep't of Social Services, 436 U.S. 658 (1978). Plaintiff's claims against Baker fails in this regard.

> "This is a claim of deliberate indifference, neglect, negligence, discrimination, professional misconduct on part of Ms. Mowry medical PA. I submitted a medical slip and was placed on the call-out on 2-11-10 and seen by Ms. Mowry. I was in chronic pain she refused me any medical treatment. I asked her to examine the lump on my chest at the collar bone. She told me their [sic] nothing wrong with me and became very hostile toward [me] that the x-ray indicate I'm not injured. I again ask her to examine [me] because not once has she examined me and if their [sic] nothing wrong with me why is it a bone protruding out my chest. She told me she not going to second guess another PA, even giving all of her attention to the officer in the room with her. I told her she don't have to be so mean, she told me I ain't seen mean yet[,] then began to yell at me tell me to get out the office now."

ECF No. 127, page 91.

Plaintiff's initial grievance was rejected by Ms. Adams on February 24, 2010, because the "issues presented … are being reviewed and addressed in Grievances 307831 and 307841." Id. at page 92. In response to the rejection, Plaintiff appealed to Superintendent Sobina by letter dated March 1, 2010, explaining that the other grievances complained about the denial of medical treatment on different dates [id. at page 93].[13] By decision dated March 4, 2010, Plaintiff was allowed to resubmit the original grievance [id.].

The resubmitted grievance was received by Adams on March 8, 2010. Id. at 94. The grievance was denied by Maxine Overton on March 19, 2010, on the basis that Mowry evaluated Plaintiff on February 11, 2010, noting no gross deformity or any difficulty of movement of the right shoulder, but referring Plaintiff to Dr. Gilreath who examined Plaintiff a week later. Id. at 95.

Plaintiff claims that at this point prison officials thwarted his participation in the grievance process because he did not receive Overton's March 19th denial in a timely manner so as to allow him to file a timely appeal of her decision to the Superintendent. The record bears this out since Plaintiff filed a Request to Staff slip dated and received by Adams on March 31st,

---

[13] DC-ADM 804 provides that an inmate must submit a different grievance for each different event.

complaining that he had not received a response to his resubmitted grievance (which was due to be returned to him by March 22nd). ECF No. 127-1, page 1. Adams' response to that Request to Staff indicates only "this was completed 3/19/2010." Id. In his Opposition, Plaintiff explains how prison officials interfered with his access to the grievance process:

> … she intentionally withheld the Plaintiff initial review response ["IRR"] to hinder the Plaintiff from appealing. When the Plaintiff didn't receive the IRR timely he submitted a request of Staff to Ms. Adams. She responded stating it was completed on 3/19/10. However, she still did not send the Plaintiff IRR so that he may appeal.

> On 4/4/10, the Plaintiff submitted another Request of Staff to Ms. Adams, complaining she was not forwarding the grievance response. The Plaintiff also sent a Request of Staff to Superintendent Sobina, complaining about Grievance 308385 that he didn't receive it and requested the answer so he may respond (appeal). Ms. Adams again intercepted this mail to the Superintendent and responded that Plaintiff was just trying to receive free copies. (Exh 12)

ECF No. 126, pages 17-18.

It is not clear from the record when Plaintiff received the IRR, but by letter dated April 9, 2010, Plaintiff appealed that decision. ECF No. 127, pages 96-97. In the appeal, Plaintiff explained that he had not received the March 19th denial in a timely manner, but Superintendent Sobina dismissed the appeal as untimely indicating that although "… Adams did recently provide [Plaintiff] with a copy of the initial review response, … that does not prove that [Plaintiff] did not receive the initial review response when it was completed." Id. at 97. Plaintiff appealed Sobina's decision to Central Office and Sobina's decision was upheld. Id. at 98-99.

It is Defendants' burden to prove Plaintiff's failure to exhaust. See Small, 728 F.3d at 271 Ray, 285 F.3d at 295. Although the record reflects that Plaintiff attempted to exhaust his administrative remedies on this claim by presenting it at all three levels of the review process, it does not appear that the administrative remedy process was available to Plaintiff.

The Third Circuit has held that interference with an inmate's attempts at exhaustion may

impact the *availability* of the administrative remedy process within the meaning of 42 U.S.C. § 1997e. Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003) ("A grievance procedure is not available even if one exists on paper if the defendant prison officials somehow prevent a prisoner from using it."). See also McKinney v. Guthrie, 2009 WL 274159, at *1 (3d Cir. 2009) ("[A]n administrative remedy may be unavailable if a prisoner is prevented by prison authorities from pursuing the prison grievance process."). Additionally, the failure to timely respond to a grievance has been held to make the administrative remedy process unavailable to an inmate. Small, 728 F.3d at 273 ("[…] when Small failed to receive even a response to the grievances addressing the June 18 and June 28, 2005 incidents, much less a decision as to those grievances, the appeals process was unavailable to him.").[14]

Defendants have failed to meet their burden here, and so accordingly, summary judgment should be denied in this regard.


### 2) Legal Analysis of Remaining Deliberate Indifference Claims against PHS Defendants Telega and Mowry

So then, the only claims against the PHS Defendants that survive the exhaustion analysis are those claims arising out of the alleged deliberate indifference by Telega on January 28th and Mowry on February 1st and February 11th.

---

[14] Id. citing Lewis v. Washington, 300 F.3d 829, 833 (7th Cir. 2002) (agreeing with the Eighth and Fifth Circuits that "administrative remedies [are] exhausted when prison officials fail to respond to inmate grievances because those remedies ha[ve] become 'unavailable' "); Jernigan v. Stuchell, 304 F.3d 1030, 1032 (10th Cir. 2002) ("[T]he failure to respond to a grievance within the time limits contained in the grievance policy renders an administrative remedy unavailable"); Boyd v. Corrs. Corp. of Am., 380 F.3d 989, 996 (6th Cir. 2004) ("[A]dministrative remedies are exhausted when prison officials fail to timely respond to a properly filed grievance"); Power v. Ennis, 177 F.3d 393, 394 (5th Cir. 1999) ("A prisoner's administrative remedies are deemed exhausted when a valid grievance has been filed and the state's time for responding thereto has expired.").

### a. The allegations

According to the complaint, Plaintiff was examined by Defendant Telega on January 28, 2010, the date of the Incident with Officer Hewitt. Plaintiff alleges that Telega treated him "aggressively" and "meanly," and when Plaintiff was physically unable to put his right arm behind his back (due to his broken collar bone), Telega "became angry, and aggressively and vindictively applied pressure to the Plaintiff [sic] collarbone." ECF No. 4, ¶ 35. Telega allegedly cursed at Plaintiff and told him he was faking, and told him to "get the fuck out his office and to get dress [sic] in the hallway." Id. at ¶ 36. Plaintiff received no pain medication, no ice for swelling, and no x-ray at this medical visit and Defendants Telega and Department of Corrections employee Nurse Lucas denied that any injury existed. Id. at ¶ 38.

Plaintiff was seen by Defendant Mowry on February 1, 2010, but Mowry refused to provide Plaintiff with any medical treatment and did not perform any physical exam. Plaintiff showed his swollen collarbone to Mowry and he was asked to leave her office. Id. at ¶¶ 39 - 40.

On February 11, 2010, Plaintiff was seen by Defendant Mowry for his "chronic pain from his chest and shoulder that his collarbone protruding out his chest." Id. at ¶ 49. Defendant Mowry refused any medical treatment. When Plaintiff requested that Defendant Mowry perform an exam of the lump on this chest, she became hostile and told him the x-ray indicated there were no injuries. Id. at ¶ 50.

### b. Deliberate indifference standard

In the medical context, a constitutional violation under the Eighth Amendment occurs only when state officials are deliberately indifferent to serious medical needs. Estelle v. Gamble, 429 U.S. 97 (1976). The standard is two-pronged, "[i]t requires deliberate indifference on the part of prison officials and it requires that the prisoner's medical needs be serious." West v.

Keve. 571 F.2d 158, 161 (3d Cir. 1978).  A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).

"To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm."  Giles v. Kearney, 571 F.3d 318, 330 (3d Cir. 2009). Deliberate indifference may be manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer, 991 F.2d at 68, or "persistent conduct in the face of resultant pain and risk of permanent injury" White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).  Deliberate indifference is generally not found when some level of medical care has been offered to the inmate.  Clark v. Doe, 2000 WL 1522855, at *2 (E.D. Pa. 2000) ("courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care").

The PHS Defendants move for summary judgment on three grounds: 1) Plaintiff has failed to produce expert testimony necessary to establish deliberate indifference to a serious medical need; 2) Plaintiff had no serious medical need; and 3) Telega and Mowry did not exhibit deliberate indifference.  Summary judgment should be denied in this regard because there are disputed material issues of fact as to whether Plaintiff's condition rose to the level of a serious medical need and whether Telega's actions on January 28th and Mowry's actions on February 1st and 11th constituted deliberate indifference towards that need.[15]

---

[15] One of Plaintiff's exhibits in opposition to the motion for summary judgment is the subject of a motion to strike by the PHS Defendants. See ECF No. 133. This "Exhibit 3" is a printout from a website, orthoinfo.aaos.org, with a copyright of 2007 by the American Academy of Orthopedic Surgeons. The seven-page exhibit is entitled "Shoulder Trauma" and provides an overview of the

Defendants argue that Plaintiff did not have a fractured clavicle or sternum, while Plaintiff argues to the contrary. Both parties have provided evidence in support of their arguments. <u>See</u> ECF No. 116-5, Affidavit of Telega; ECF No. 116-6, Affidavit of Gilreath; ECF No. 127, page 60, Affidavit of Marshall. Although Plaintiff's medical records are part of the evidentiary record before this Court, Plaintiff contradicts almost every notation through his own affidavits and contends that these allegedly false notations are part of the cover-up of the assault by Hewitt. Because this Court cannot weigh the credibility of evidence on a summary judgment analysis and because the Court must draw inferences in the light most favorable to the non-moving party, the motion for summary judgment should be denied as to this claim. <u>See</u> <u>Scott</u>, 550 U.S. at 378.

### E. Commonwealth Defendants' Motion for Summary Judgment

#### 1) Exhaustion

The Commonwealth Defendants argue that Plaintiff failed to exhaust some of the retaliation claims against McConnell and Breckenridge. These retaliation claims arise out of three separate incidents: 1) the misconduct issued by Officer Fries on February 2, 2010 (B144269 for possession of contraband); 2) the misconduct issued by Breckenridge on February 13, 2010 (A913573 for refusal to obey an order); and 3) Plaintiff's loss of employment in the food service department.

##### a. Misconducts

Defendants move for summary judgment based on Plaintiff's failure to exhaust the claims through the misconduct appeal process. Defendants have provided evidence that Plaintiff did not

---

anatomy of the shoulder and types of shoulder injuries. This exhibit is irrelevant to the legal analysis at hand as it cannot be used to prove that Plaintiff has any of these injuries.

appeal either misconduct.[16] See ECF No. 115-3, Declaration of Zachary Moslak, Hearing

Examiner Supervisor, page 21. Defendants' argument here is inapposite. Plaintiff could not have

raised his claims of retaliation in the appeal of either of the misconduct charges since the process

does not permit such a claim to be raised.[17] Furthermore, as to Misconduct B144269, Plaintiff

could not have claimed that McConnell was retaliating against him since another officer issued

the misconduct. Plaintiff would have had to raise his retaliation claims through the administrative

remedy process under DC-ADM 804. Defendants have not provided any evidence as to

Plaintiff's exhaustion (or lack thereof) of the retaliation claim against McConnell through the

DC-ADM 804 process.[18] Because Defendants have failed to meet their burden, summary

judgment should be denied in this regard.

---

[16] In opposition, Plaintiff argues that he could not properly exhaust the two misconducts because he was found "not guilty" and so had no available remedy to exhaust. ECF No. 126, page 19. DC-ADM 801, Section 5, provides that appeals of "not guilty" findings are not permitted. However, Plaintiff's argument is disingenuous as to the facts of this case, as to at least one of the misconducts at issue here. Plaintiff's contention that he was found "not guilty" of misconduct B144269 is not confirmed by the record as there is no indication whether Plaintiff was found "guilty" of "not guilty" of the infraction charged. ECF No. 115-1, pages 59-61.

[17] DC-ADM 801 explains the appeal process relative to inmate discipline, which differs slightly from DC-ADM 804. Following a finding of "guilty," misconducts can be appealed first to the Program Review Committee, second to the Facility Manager, and finally to the Office of Chief Counsel of the Department of Corrections. Furthermore, the Policy specifically limits the bases of such an appeal to:

> 1) The procedures used were violative of law, Department of Corrections directives, or regulations;
> 2) the punishment was disproportionate to the offense; and/or
> 3) the findings of fact were insufficient to support the decision of the Hearing Examiner.

See DC-ADM 801, § 5(A)(1)(a-c). Like DC-ADM 804, there are time limitations in which to file appeals.

[18] Although it is not his burden, Plaintiff has produced evidence showing that he filed a grievance (308316) challenging the "retaliation, intimidation and harassment" by McConnell and others arising out of the February 2nd misconduct. See ECF No. 127-1, pages 11-17. The

The record reflects that Plaintiff did file a grievance through the DC-ADM 804 process against Breckenridge claiming retaliation based on the February 13th misconduct.

Grievance 308210 reads:

> This grievance is claim of retaliation and intimidation on part of kitchen steward [Breckenridge]. On 2-13-10, while at dietary for work, after completing my work detail of mourning [sic] meal time for line 3 the workers normally wait in their dining hall until meal time. While in the dining hall 3 and after from working and sitting for a while, I stood up to stretch my chest and shoulder from a current and document injury which I'm also currently on medication for. I then heard [Breckenridge] from all the way from across the dining hall yell my name "MARSHALL." I answered him and he told me to get my coat. I got my coat and returned to him where he was at the exit in dining hall 3 at the medal [sic] detector from where I heard him call me. Then asked him why he wanted me to get my coat? He told me I was going back to the block because he had to call my name more than once because I was exercising. I told him I was stretching and that I ain't hear him. He told me it don't matter. So I said you going to send me back because of this? I said me and you and never have any problem befor [sic] why are you doing this. [Breckenridge] then told me <u>"he don't have a problem with me that he was told if I do anything am to be written up and removed from my job he just doing his job."</u> Have not been allowed to return to work since, also, I have never had any problem befor [sic] this incident, nor have I been in the kitchen for 60 days yet.

ECF No. 115-2, page14 (emphasis in original).

By decision dated February 24, 2010, Grievance Officer Jeffrey Walter denied Plaintiff's grievance as frivolous indicating that it had been filed "in retaliation for the misconduct [for refusal to obey an order]." <u>Id</u>. at 13. Plaintiff appealed Walter's decision to the Superintendent complaining that Walter failed to address the retaliation component of Plaintiff's claim. The Superintendent upheld the decision, Plaintiff appealed to the Central Office and that appeal was also denied. <u>Id</u>. at 10-11. Because Plaintiff presented the issue of Breckenridge's retaliation to all three levels of the administrative remedy process, Plaintiff's claim is exhausted, regardless of

---

grievance was rejected as being related to a misconduct and appropriate for appeal through the DC-ADM 801 process. <u>Id</u>. Plaintiff's appeals of the rejection were unsuccessful. <u>Id</u>

whether the prison officials receiving and reviewing the grievances and appeals recognized the issue presented to them.

### b. Loss of Employment

Next, Defendants move for summary judgment on the retaliation claim based on the termination of Plaintiff's employment. Defendants argue that Plaintiff did not grieve the termination of his employment. ECF No. 115-3, Declaration of Melinda Adams, Facility Grievance Coordinator, page 3, ¶ 7. Ms. Adams explains generally that Plaintiff was removed from his dietary job on March 5, 2010, and that he did not file any grievance concerning the decision to remove him from his job. Id.

However, it is not clear what remedies were available to Plaintiff to raise a retaliation claim based on the termination of his employment. The record before this Court is far from clear as to why Plaintiff lost his job. The record reflects that Plaintiff was suspended without pay from his food service job on February 25th due to the misconduct he received from Breckenridge for failure to obey an order. ECF No. 115-2, page 23. Furthermore the Unit Management Team indicated that it "is in are [sic] best interest to remove him from his job in dietary." Id. Plaintiff was officially removed from his job on March 5th. Id. at 24. Another part of the record tells a different story, namely that Plaintiff's food service employment was terminated based on the earlier (February 2nd) misconduct for contraband. ECF No. 127-1, page 50 ("a check of your history shows you were employed in Dietary where you received a misconduct for passing Swiss cheese resulting in job removal via a support team action.").

In any event, to the extent the employment termination was based on a misconduct, Plaintiff could not have appealed the retaliation issue since, according to DC-ADM 801, that issue is not a valid basis for an appeal. To the extent that Plaintiff could have filed a grievance on

this issue, the record demonstrates that it is likely such a grievance would have been rejected as related to a misconduct or related to previously filed grievances.

The failure to exhaust does not provide a valid basis for summary judgment.

### 2) Deliberate Indifference Claim against Nurse Lucas

Plaintiff alleges that Defendant Lucas initially denied him emergency admission to the Medical Department until Plaintiff wrote up a sick call slip requesting medical attention. Id. at ¶¶ 32-34. Plaintiff alleges that once he arrived at the Medical Department, he was seen by Defendant Lucas who only took his vital signs and interrogated him in a hostile manner about the cause of his injuries. Id. at ¶ 34. Plaintiff alleges that Defendant Lucas deliberately advised PA Telega, who conducted the physical examination, that Plaintiff was alluding to an assault by an officer and Defendant Lucas attempted to "sabotage and deprive the Plaintiff of treatment to cover evidence of Defendant Hewitt's assault." Id.

The Eighth Amendment claim against Nurse Lucas is based solely on delay. However, the record before this Court reflects that Plaintiff requested medical attention between 7:30 and 8:30 am on the morning of the incident with Officer Hewitt. ECF No. 115-1, Plaintiff's Deposition, page 16. The incident/injury report indicates that the injury occurred around 7:30 am and that Plaintiff walked to the medical department and was seen by Nurse Lucas at 8:50 am. ECF 115-2, page 2. Lucas took Plaintiff's vital signs and charted Plaintiff's description of his injuries and referred him to Physician's Assistant Telega. ECF Nos. 115-1, page 2-3; 115-1, page 17. Plaintiff admits that he saw Telega "a few minutes" later (ECF No. 115-1, page 17), and the chart shows that Telega saw Plaintiff at 9:15 am (ECF No. 115-1, page 44).[19]

_____

[19] In his Response to Commonwealth Defendants' Concise Statement, Plaintiff admits that Telega saw him a "few minutes" later at 9:15 am. ECF No. 125, ¶¶ 19-20.

Given the extent of Plaintiff's alleged injuries[20], such a short delay does not constitute deliberate indifference. See Natale v. Camden County Corr. Facility, 318 F.3d 575 (3d Cir. 2003) (finding a possible constitutional violation where an insulin-dependent diabetic was denied insulin for twenty-four hours); Grieveson v. Anderson, 538 F.3d 763, 779 (7th Cir. 2008) (guards could be held liable for delaying treatment of a broken nose for a day and one-half); Edwards v. Snyder, 478 F.3d 827, 830-31 (7th Cir. 2007) (plaintiff who painfully dislocated his finger and was needlessly denied medical treatment for two days stated a deliberate indifference claim); Andugarv v. Rodriguez, 486 F.3d 1199, 1204 (11th Cir. 2007) (a two-hour delay in pretrial detainee's receipt of stitches is a tolerable delay that did not rise to the level of a constitutional violation).

Plaintiff also alleges that Nurse Lucas was hostile towards him. While such an allegation if true would be unfortunate behavior from a medical professional, hostility and incivility do not rise to the level of a constitutional violation. Hankins v. Beard, 2009 WL 5821032, at *16 (W.D. Pa. 2009) ("It is well-settled that the use of words, no matter how violent, is not actionable under 42 U.S.C. § 1983."). See also Wright v. O'Hara, 2004 WL 1793018, at *7 (E.D. Pa. 2004) ("[w]here plaintiff has not been physically assaulted, defendant's words and gestures alone are not of constitutional merit") (citations omitted); MacLean v. Secor, 876 F.Supp. 695, 698-99 (E.D. Pa. 1995) ("[i]t is well-established that verbal harassment or threats ... will not, without some reinforcing act accompanying them, state a constitutional claim"); Murray v. Woodburn, 809 F.Supp. 383, 384 (E. D.Pa.1993) ("Mean harassment ... is insufficient to state a constitutional deprivation") (listing cases).

---

[20] For purposes of the Eighth Amendment delay claim against Lucas only, this Court will assume that Plaintiff suffered a fracture of the sternum and/or clavicle.

Summary judgment should be granted as to this claim against Lucas and he should be terminated as a party to this action.


### 3) Retaliation Claims

The retaliation claims surviving the exhaustion analysis are based on: 1) the misconduct issued by Officer Fries on February 2, 2010 (B144269 for possession of contraband); 2) the misconduct issued by Breckenridge on February 13, 2010 (A913573 for refusal to obey an order); 3) Plaintiff's loss of employment in the food service department; and, 4) the four cell searches (between February 2nd and  March 8th).

### a. Standard

It is well-settled that "[g]overnment actions, which standing alone, do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right."  Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003) quoting Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000).  See also Anderson v. Davila, 125 F.3d 48, 161 (3d Cir. 1997) ("An otherwise legitimate and constitutional government act can become unconstitutional when an individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment rights."); White v. Napoleon, 897 F.2d 103, 111-12 (3d Cir.1990) ("Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under section 1983.").

In order to state a *prima facie* case of retaliation, a prisoner plaintiff must allege:

1)  The conduct in which he was engaged was constitutionally protected;

2)  he suffered "adverse action" at the hands of prison officials; and

> 3) his constitutionally protected conduct was a substantial or motivating factor for the adverse action.

Carter v. McGrady, 292 F.3d 152, 157-58 (3d Cir. 2002) quoting Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001). See also Holbrook v. Walters, 296 Fed. App'x 230, 233 (3d Cir. 2008).

### b. Plaintiff's *prima facie* case

Plaintiff alleges that following the filing of the grievances about the incident with Hewitt and the denial of medical treatment, Officer McConnell (and to a more limited extent, Sobina) began to retaliate against him. This retaliation included the issuance of the two misconducts, the loss of his employment, and repeated cell searches on February 2nd, 10th, 14th and March 8th. ECF No. 4, ¶¶ 42-47, 58. Each search resulted in Plaintiff's cell being left in disarray. Id. The March cell search also included a strip search. Id. at ¶ 58.

Here, Plaintiff's filing of the grievances in February and March is constitutionally protected conduct. Laurenzau v. Romarowics, 528 Fed. App'x 136, 139 (3d Cir. 2013); Rauser, 241 F.3d at 333; Milhouse v. Carlson, 652 F.2d 371, 73-74 (3d Cir. 1981). To show the necessary "adverse action" component, the prisoner plaintiff must demonstrate that defendants' actions were "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." Allah v. Al-Hafeez, 208 F.Supp.2d 520, 535 (E.D. Pa. 2002) quoting Allah v. Seiverling, 229 F.3d at 225. Four cell searches in a five-week period, along with the issuance of two misconducts and the loss of a prison job constitute adverse action as these things (especially taken together) are "sufficient to deter a person of ordinary firmness from exercising his rights."

The third essential element of a retaliation claim is the causal link between the exercise of the constitutional right and the adverse action taken against the prisoner. Rauser, 241 F.3d at 333-34. To establish the requisite causal connection on a retaliation claim, a plaintiff must prove

either: (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. See Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir. 1997).

When examining issues of causation, the Third Circuit has specifically warned:

> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take. The point we make is not theoretical as we do not doubt that public actors are well aware that persons disappointed with official decisions and actions frequently bring litigation against the actors responsible for the decisions or actions in their individual capacities, and the actors surely would want to avoid such unpleasant events.

Lauren W. ex rel Jean W. v. DeFlaminis, 480 F.3d 259, 267-68 (3d Cir. 2007).

"Mindful of these concerns, courts must scrutinize inmate claims of retaliation premised solely on circumstantial proof of a temporal proximity between the plaintiff's conduct and the allegedly retaliatory acts." Keeling v. Barrager, 2014 WL 1338077, at *9 (M.D. Pa. April 3, 2014). Temporal proximity "must be measured in days, rather than in weeks or months, to suggest causation without corroborative evidence." Conklin v. Warrington Tp., 2009 WL 1227950, at *3 (M.D. Pa. 2009). See also Keeling, at * 9 ("Applying this standard, courts in civil rights cases have frequently rebuffed speculative efforts to infer causation from temporal proximity when a span of weeks, months, or years separated the plaintiff's constitutionally protected conduct from the defendants' alleged acts of retaliation.") (listing cases).[21]

---

[21] Id. ("Our sister courts have held that a temporal proximity of as little as seventeen days was insufficient to establish causation. See Killen v. N.W. Human Servs., Inc., 2007 WL 2684541, at *8 (E.D. Pa. 2007) (holding that temporal proximity of seventeen days was insufficient to establish causation); see also Farrell [v. Planters Lifesavers Co.], 206 F.3d [271] at 279 n.6 [(3d Cir. 2000)] (suggesting that temporal proximity of seven weeks would be insufficient to establish causation); Smith v. ABF Freight Sys., Inc., 2007 WL 3231969, at *11 (M.D.Pa. 2007) (holding that temporal proximity of one and one-half months was insufficient to establish causation); Mar

While the January 29th grievance and the February 2nd misconduct and cell search are extremely "temporally suggestive," Defendants have provided evidence that McConnell could not have known about the January 29th grievance until February 4th, at the earliest. [22] This evidence, unchallenged by contradictory evidence[23], means that there is no causal connection between the January 29th grievance and the February 2nd misconduct and cell search. Accordingly, Plaintiff has failed to state a *prima facie* case of retaliation based upon the February 2nd misconduct and cell search. However, the receipt of the January 29th grievance by McConnell around February 4th is temporally suggestive enough to serve as the causal connection to the subsequent adverse actions (the remaining three cell searches in four weeks, the issuance of the second misconduct and the loss of the prison job).

### c. Legitimate Penological Interest

Following the satisfaction of a *prima facie* case of retaliation, the burden then shifts to the defendants to demonstrate, by a preponderance of the evidence, that their actions would have

---

v. City of McKeesport, 2007 WL 2769718, at *4 (W.D. Pa. 2007) (holding that temporal proximity of three months was insufficient to establish causation)".

[22] Plaintiff filed a grievance about the incident with Hewitt the day following the incident. The record reflects that while the grievance was dated January 29th, the grievance was not received and processed by the Grievance Coordinator until February 3rd, as reflected in the acknowledgement section of the document. ECF No. 115-3, pages 2-4. In processing the inmate grievances, Ms. Adams would have categorized it, assigned it and put it into the institution's internal mail to the security office that same day and McConnell would have received the grievance, at the earliest, the following day or February 4th. ECF No. 115-1, page 90.

[23] In opposition, Plaintiff provides his own affidavit swearing that Inmate Muslim told Plaintiff that Lt. McConnell questioned him about the incident between Plaintiff and Hewitt on January 28, 2010, the day of the incident. ECF No. 127, page 56. Plaintiff's evidence in this regard does not establish the necessary causal connection to establish the *prima facie* case as there must a causal connection between the constitutionally protected conduct and the adverse action. Here, the constitutionally protected conduct is the filing of the grievance against Hewitt; it is not the physical confrontation between Plaintiff and Hewitt. So any factual dispute as to whether and when McConnell became aware of the confrontation is immaterial to the analysis of the retaliation claim here.

been the same, even if plaintiff was not engaging in the constitutionally protected activities. Carter, 292 F.3d at 158. "Once a prisoner has demonstrated that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 334.

Defendants argue that their actions were taken for reasons reasonably related to a legitimate penological interest.

### Second Misconduct

Retaliatory discipline claims fail when there is "some evidence" supporting a guilty finding for the charges. Nifas v. Beard, 374 Fed.App'x 241, 244 (3d Cir. 2010) citing Henderson v. Baird, 29 F.3d 464, 469 (8th Cir. 1994) (explaining that a finding that the inmate actually committed the misconduct essentially "checkmates" his retaliation claim).

Here, the Hearing Examiner issued a Reprimand and Warning to Plaintiff on this misconduct. ECF No. 115-2, pages 7-8. This determination "checkmates" Plaintiff's retaliation claim as it demonstrates that Defendants had a legitimate penological interest in issuing the misconduct.

### Loss of Employment

As previously discussed, there is a factual dispute as to the reason Plaintiff's employment was terminated. See supra, pages 24-25. See also ECF No. 115-2, pages 23-24, Staffing Notices; ECF No. 115-3, pages 10-11, Declaration of Linda Traut, Corrections Food Service Manager, ¶¶ 5-6. Without a definitive reason for the termination of the employment, this Court cannot engage

in an analysis as to whether the termination was reasonably related to a legitimate penological interest. Therefore, this claim should survive summary judgment.

**Cell Searches**

Plaintiff has stated a *prima facie* case as to the adverse action based on the three cell searches (February 10th, February 14th and March 8th)[24] and Defendants do not put forward any legitimate penological reason for the cell search of February 10th.

Initially, as to the February 14th and March 8th cell searches, Defendants argue that McConnell was not working on either date and provide Duty Rosters to support this factual contention. ECF No. 113, page 15. Plaintiff disputes this, claiming that 1) Defendants have altered the Duty Rosters and 2) Defendants should be precluded from using this evidence since it was not produced during discovery. However, whether McConnell was working on the dates of these two cell searches is of no moment to the analysis at hand. McConnell's absence from the facility on any given day does not demonstrate that he did not orchestrate a campaign of retaliation against Plaintiff by directing others to conduct the cell searches on these dates.

Next, Defendants claim there was a legitimate penological interest in the random cell search on February 14th because every inmate is subject to at least two random cell searches per year per unspecified Department of Corrections policy. See ECF No.115-2, page 4, McConnell Declaration, ¶ 8. In opposition, Plaintiff argues that DC-ADM 203, the Department of Corrections policy covering "Searches of Inmates and Cells," only indicates that "all areas <u>other than inmate living quarters</u> are searched a minimum of two times per year." See ECF No. 127-1, page 95. A review of the policy reveals that DC-ADM 203 does not specify that random searches shall be conducted on inmate living quarters. See ECF No. 127-1, pages 95-100; ECF No. 127-

---

[24] As previously discussed, there is no causal connection to support the February 2nd cell search as part of Plaintiff's *prima facie* case.

2, pages 1-3. Because Plaintiff has rebutted Defendants' stated explanation for the February 14th cell search, summary judgment should be denied.

Finally, Defendants argue that the March 8th cell search was an investigative search based upon contraband found during the February 14th cell search.[25] According to Defendants, Inmate Chadwick, a "problematic inmate with a long history of misconducts," was Plaintiff's cellmate on both February 14th and March 8th. See ECF No. 115-3, pages 17-19, Declaration of Jeffrey White, dated October 1, 2013, ¶ 6. White swears the March 8th investigative search was based "**either** […] on the 2/14/10 search which produced a broken razor, [belonging to Chadwick] **or** additional information that **may** have been received about [Plaintiff's cellmate Inmate Chadwick], particularly given his history." Id. (emphasis added).

It is at this particular juncture that several factual disputes arise which preclude summary judgment. In his opposition to Defendants' evidence, Plaintiff claims that his cellmate on February 14th was not Inmate Chadwick, but was instead Inmate Williams. In support of his argument, Plaintiff provides evidence in this regard, specifically the affidavit of Inmate Williams, along with a Cell History of Inmate Williams. See ECF No. 127-1, pages 69-70; 127-

---

[25] Furthermore, Defendants explain that an investigative cell search "typically involves or necessitates a strip search of the cell's occupants" and would have been "part and parcel of the investigative search procedure … triggered by Inmate Chadwick's actions [during the February 14th cell search]." Id. at ¶ ¶ 5, 7. However, DC-ADM 203 does not indicate that a strip search is part and parcel of an investigative cell search. Instead, the policy provides that a strip search "shall be conducted when necessary for the security and good order of the facility, including the following situations: (1) Before and after every contact visit; (2) Upon an inmate's return from outside activities, supervised outside leave, and furloughs; (3) Upon reception, return from court, and return after the inmate has left the facility reservation for any reason; (4) Following an activity where an inmate has had the opportunity to mingle with outside groups, particularly where there are large numbers of people under minimal supervision; (5) Periodically for an inmate who is permitted to move in and out of the gate areas; (6) When there is reason to believe that an inmate is in an escape plot or possession of contraband; (7) When an inmate enters or leaves any restricted area; (8) When an inmate is admitted/discharged from a Security Level 5 Housing Unit or Mental Health Unit; and (9) Prior to being transported outside the secure perimeter." ECF No. 127-1, page 100.

2, pages 20-21. In his Affidavit, Williams indicates that he was celled with Plaintiff from December of 2009 until he was transferred to a state prison in Michigan in "the middle of February 2010." ECF No. 127-1, page 69, ¶ 2. Williams swears that he was Plaintiff's cellmate during the cell searches of February 2nd, February 10th, and February 14th. Id. at ¶ ¶ 4- 5, 11-12. The Cell History of Inmate Williams provided by Plaintiff shows that Williams was housed in the same cell from November 27, 2009 through February 17, 2010 when he was transferred. See ECF No. 127-2, page 20.

The conflict over the identity of Plaintiff's cellmate during the February 14th cell search represents a dispute over a material fact and so summary judgment is inappropriate. Roth v. Norfalco LLC, 651 F.3d 367, 373 (3d Cir. 2001) quoting Lamont v. New Jersey, 637 F.3d 177, 181 (3d Cir. 2011) ("Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party.'").

Furthermore, both parties contend that the opposing evidence on this point is in some way suspect. Plaintiff has filed a Motion to Strike Defendants' Exhibits, as well as a Motion for Sanctions. ECF Nos. 123, 128. Plaintiff claims that some of the evidence has been tampered with by Defendants and that some of the evidence should have been produced during discovery. In response, Defendants claim that Plaintiff's exhibits have been deliberately altered and Defendants provide the Declaration of Security Captain Earl Jones to prove the truth of the matter. ECF No. 130; 130-1. These issues will be resolved separately by this Court and need not be addressed any further here as on a summary judgment motion a court must not weigh evidence or make credibility determinations. Anderson, 477 U.S. at 255. See also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) quoting Anderson, 477 U.S. at 255 ("In

considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'").

### F. The Claims Remaining for Trial

In summary, the claims remaining for trial are:

- Eighth Amendment medical claim against Telega stemming from the January 28th examination;
- Eighth Amendment medical claims against Mowry stemming from the February 1st and February 11th examinations;
- Retaliation claims based on the adverse action of termination of employment and the cell searches of February 10th, February 14th and March 8th.

### III. CONCLUSION

For the foregoing reasons, it is respectfully recommended that the motion for summary judgment filed by Prison Health Services Defendants Baker, Telega, Gilreath and Mowry [ECF No. 116] be GRANTED IN PART AND DENIED IN PART, as follows:

- Granted on the basis of failure to exhaust as to the claims against Baker and Gilreath;

- Denied on the basis of failure to exhaust  as to the claims against Mowry and Telega;

- Denied on the basis of failure to show deliberate indifference to a serious medical need.

Defendants Baker and Gilreath should be dismissed as parties to this action.

It is further recommended that the partial motion for summary judgment filed by the Commonwealth Defendants [ECF No. 112] be GRANTED IN PART AND DENIED IN PART, as follows:

- Denied on the basis of failure to exhaust;

- Granted with regard to the deliberate indifference claim against Defendant Lucas based upon delay in medical treatment;

- Granted as to the retaliation claims based on Misconduct B144269 for Possession of Contraband and the concomitant cell search of February 2nd, and Misconduct A913573 for Refusal to Obey an Order;

- Denied as to the retaliation claims based on the termination of employment and the cell searches of February 10th, February 14th and March 8th.

Defendant Lucas should be dismissed as a party to this action.

In accordance with 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72, the parties must seek review by the district court by filing Objections to the Report and Recommendation within fourteen (14) days of the filing of this Report and Recommendation.  Any party opposing the objections shall have fourteen (14) days from the date of service of Objections to respond thereto.  See Fed.R.Civ.P. 72(b)(2).  No extensions of time will be granted.  Failure to file timely objections may constitute a waiver of appellate rights.  See Brightwell v. Lehman, 637 F.3d 187, 193 n.7 (3d Cir. 2011); Nara v. Frank, 488 F.3d 187 (3d Cir. 2007).


/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

Dated:  June 2, 2014